The Law Office of James M. Branden
80 Bay Street Landing, Suite 7J
Staten Island, New York 10301
Tel. 212-286-0173
Fax 212-481-8250

December 13, 2022

Hon. Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

            Re:  United States v. Contantinescu
                 Cr. Docket No. 19-651 (SHS)

Dear Judge Stein:

    I represent Alexandru Radulescu who is to be sentenced in the
above-referenced matter on January 3, 2023, at 4:30 p.m.  This
matter was adjourned from an earlier sentencing date of December 1,
at 11:00 a.m., principally because the Court wanted all trial
defendants to be sentenced at once.

    I am presently on trial before Judge Oetken.  I have re-read
the sentencing memorandum I had planned to file in advance of the
earlier sentencing date and I stand by it.  To the extent some of
the information is out-dated (perhaps other relevant co-defendants
have been sentenced or conditions at jails have changed, e.g.), I
am otherwise too occupied to update Mr. Radulescu's opening
sentencing submission and will address any such matters in reply.

                    Respectfully submitted,

                    James M. Branden

The Law Office of James M. Branden
80 Bay Street Landing, Suite 7J
Staten Island, New York 10301
Tel. 212-286-0173
Fax 212-481-8250

November 10, 2022

Hon. Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

                Re:  United States v. Contantinescu
                     Cr. Docket No. 19-651 (SHS)

Dear Judge Stein:

     I represent Alexandru Radulescu who is to be sentenced in the above-referenced matter on December 1, at 11:00 a.m.  For the reasons stated below, the Guidelines calculation set forth in the Presentence Report (PSR) is incorrect in certain regards and Mr. Radulescu should benefit from a significant downward variance.

**STATEMENT OF THE CASE**

     Mr. Radulescu is 36 years old with no prior criminal convictions.  He was born in Romania and has lived most of his life outside of the United States.  His path to this Courthouse and more specifically to the trial has been a strange one.

<u>Background</u>

     In Bucharest, Mr. Radulescu grew up in a multi-generational home with his parents, Gabriel and Tania, a paternal uncle, paternal grand-parents, and a younger sister.  While the house was big enough to accommodate all, in the winter months family members shared rooms to cut down on the heating costs.  Gabriel was employed as an electrician and Tania was, while the kids were toddlers, a homemaker.  As Mr. Radulescu and his sister aged, the father's income alone grew insufficient.  As a result, Tania was constrained to work outside the home cleaning houses and, to illustrate their straits, both parents quit smoking to save on expenses.  Finances still remained tight.

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 2


        Considerably worse than the poverty for Mr. Radulescu were the
effects of his father's alcoholism.  Gabriel manufactured his own
alcohol (presumably, again, to cut down on expenses), drank
regularly and to excess and when he did he was physically violent.
As detailed in the presentence report ("PSR"), Gabriel "smashed
windows, threw glass ashtrays and struck [Tania] resulting in . .
. cuts and bruises" (at ¶92).  Some of these bouts were significant
enough to warrant professional medical attention.  While Tania was
the usual target, sometimes Mr. Radulescu, too, was the object of
Gabriel's alcohol-fueled rampages.

        Mr. Radulescu was a sickly child and suffered from multiple
chronic diseases and infections.  Beginning at age 7, he suffered
from a pronounced pulmonary illness that required "special
medications" and at least two extended hospital stays.  Recent
medical records show that he continues to suffer from chronic
obstructive pulmonary disease stage II, bronchiectasis, and
pulmonary emphysema.  Apart from these lung troubles, he also
suffers from chronic gastritis (¶100).[1]

        The parents divorced when Mr. Radulescu was 13.  For a bit,
Tania and the children lived in a house that Tania had been
cleaning.  They next stayed with Tania's brother, also for a short
spell.  Tania then found a studio apartment.  When Mr. Radulescu
was 14, he and Gabriel suffered a bitter argument and the two did
not speak for five years.

        Because Tania's salary did not cover the rent even for the
studio apartment, Mr. Radulescu worked 40 hours per week during his
high school years to contribute to rent and family expenses.  The
schedule was too demanding and Mr. Radulescu became a regular
truant and performed poorly in school.  He needed an extra year to
get through high school.[2]

_____

[1]

        Numbers in parentheses following "¶." refer to paragraphs in
the presentence report.  Numbers in parentheses following "T."
refer to pages from the trial transcript.

[2]

        As set forth in the PSR, during high school, Mr. Radulescu
held the following jobs: shoe salesman, wholesale goods seller,
paint mixer in a warehouse, manual laborer for a construction firm,
cashier at an internet café, and supervisor at a video chat studio

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 3


After graduating high school and while working in the video chat room, Mr. Radulescu developed a drug habit. Beginning at 13 and until 19, Mr. Radulescu had limited himself to alcohol and got drunk on average three times a week. At 19, however, he added marijuana, ecstacy and cocaine to his three-times-per-week binges. He continued this routine until he was 23 (¶¶106-108).

Believing that his drug abuse was out of control, Mr. Radulescu decided to move to Indonesia where he was told he would likely find employment as a model (¶¶108). Without a treatment program, Mr. Radulescu successfully got sober and did not drink alcohol or use controlled substances for a full year. As so commonly happens, however, without ongoing substance abuse treatment or other support, he relapsed and several times a week used ecstasy and cocaine and, to recover, Xanex (¶108).[3]

In Indonesia, Mr. Radulescu worked occasionally as a model and party promoter. He also worked for one year as a real estate consultant (¶121). He returned to Romania in 2010 and bounced around Europe for the next several years. In London, he was employed as a laborer for a construction company (¶120).

In the summer of 2014, Mr. Radulescu moved to the United States where he stayed until August 2017, when he returned to Romania. During those three years, Mr. Radulescu made money skimming and his exploits were the subject of the recent trial before the Court.

Mr. Radulescu was determined to make a clean break with his criminal past. In Romania, between 2017 until his November 21, 2019 arrest, Mr. Radulescu worked as an Uber driver and he and a

---

(¶¶122-123). About the time of his graduation, at 19, Mr. Radulescu switched from supervisor at the studio to video chat worker (¶122). He held that position until he was 23 years old.

[3]

He continued to use Ecstasy and cocaine from 2010 until 2017 (¶108).

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 4


friend incorporated a ride-share service (¶118).[4]   He did not
"continue[] to contribute to the Skimming Organization, including
by participating in sending packages of skimming equipment into the
United States" (see ¶39).

        Mr. Radulescu's Detention

        Mr. Radulescu has been detained in the New York area since
March 13, 2020, which, unfortunately coincided with the advent of
the Covid-19 crisis.    He was detained at the Metropolitan
Correctional Center (MCC) until it was closed and since then he has
been detained at the Metropolitan Detention Center (MDC), both
notorious for inhumane treatment of inmates.   While at the MCC, Mr.
Radulescu suffered from depression as a result of frequent lockdown
conditions brought about in response to Covid-19, as to which, he
was especially susceptible and therefore especially frightened.[5]
By the summer of 2022, Mr. Radulescu took to self-medication and
used synthetic cannabis multiple times daily for a one-month period

_____

        [4]

        Among the letters I have received on Mr. Radulescu's behalf,
attached collectively as **Exhibit A**, is a letter of intent to hire
from Mihai Mihalache.   Mr. Mihalache noted that Mr. Radulescu
established himself in the ride-share business as "serious, hard
working" with "good communication skills" and "experience in this
domain."   Accordingly, "we would like to welcome him to join us as
soon [as] he will be released and [returned] to Romania."

        [5]

        Since March 2020, which is to say for more than two and one-
half years,  inmates at the MCC and the MDC have frequently been
subject to weeks-long lockdown conditions.   Time out of cells was
cut back to ten minutes three times per week, hot meals were
restricted, social and legal visits were curtailed.   Many of my
clients at the MDC reported that they and others around them were
frantic.   As of October 18, 2022, the latest BOP update, one MDC
inmate and thirty-five MDC staff are Covid-positive.   Mr. Radulescu
has taken the vaccine and boosters and has thus far remained
uninfected.   Still, the conditions of his confinement have been
detrimental to his physical, mental and social well-being.   He
complains of ambient anxiety, fear, frustration and loneliness.
Even as Covid-19 became slightly more manageable, further lockdowns
were ordered at the MDC due to gang violence.   Suffice it to say,
a prison population on edge is highly worrisome for all concerned.

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 5

(¶109).   In  2021,  he  was  placed  on  a  suicide  watch  and
psychological  intervention  follow-up  care.   And,  at  both
institutions, he has suffered from a chronic cough.  At the MDC, he
met  with  a  doctor  on  three  occasions.   He  has  been  prescribed
medication to address his gastritis and stomach-related issues.  No
medication has been prescribed for his pulonary conditions.  He has
merely been advised that he needs to undergo a bronchoscopy (¶101).

Despite depression, sometimes extreme, and physical ailments,
Mr. Radulescu has been a highly productive inmate.  He has worked
in  the  food  service  division  at  both  the  MCC  and  the  MDC.
Specifically, he took on food- and sanitation-related positions,
such as: head bakery cook, butcher, dining and dish machine worker,
line  worker,  pot  and  pan  washer,  industrial  oven  cleaner,  steam
kettle  cleaner,  and  organizer  of  the  warehouse,  refrigerators,
freezers and oven warmers.  See Letters of Food Service Supervisor
M.  Charles,  dated  June  5  and  December  18,  2021,  attached
collectively as **Exhibit B**.

He has also worked as a Unit Orderly.  See Work Performance
Rating dated August 28, 2022, attached as **EXHIBIT C**.  In his
positively glowing review, the Supervisor observed:

> Inmate does a full day's work and goes above
> and beyond his assigned job description . . .
> .  Inmate Radulescu also gives input on how to
> do things better, safer and more efficient.
> Inmate Radulescu ensures that the inmates are
> following the CDC guidelines and institutional
> guidelines to make sure that the unit is safe
> for  staff  and  inmates.   He  drives  himself
> exceptionally well.   Inmate Radulescu is a
> true leader and he performs his duties well
> and is always willing to take on additional
> duties.   Inmate Radulescu is assigned as a
> daily cleaner on the unit, he serves food and
> maintains the inmate laundry he works well
> with  staff  and  other  inmates.   Inmate
> Radulescu  is  always  willing  to  take  on
> additional tasks as needed.  Inmate Radulescu
> is also very helpful on the unit.  The work
> assignment for inmate Radulescu is vital for
> keeping  the  unit  clean  during  the  pandemic.
> Inmate Radulescu is one of the more reliable

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 6

> inmate workers on the unit he is always
> willing to train other inmates and he is an
> example of what true leadership is all about.

While in detention, Mr. Radulescu has also completed an extensive array of class work, including the following business-related courses: employment interviews, job search skills, financial literacy, FDIC Money Smart Skill (levels I-III), business ethics, leadership and influence, budget & finance, basic bookkeeping, 10 soft skills you need, business acumen, sales fundamentals, earth science, small business, time management, conflict resolution, entrepreneurship, and marketing basics. See Inmate Education Data Transcript dated August 16, 2022, attached as **EXHIBIT D**. Further, acknowledging his prior drug use, Mr. Radulescu has engaged in many group classes targeting recidivism. See class completion certificates attached collectively as **EXHIBIT E**. He also enrolled in an independent study offered at the MDC titled "The Narcotics Anonymous Step Working Guide." He has completed the first five levels. See Independent Study report dated July 20, 2022, attached as **EXHIBIT F**. Similarly, recognizing his past psychological struggles, he participated in various classes made available by the Psychological Services Division. See attached the records of attendance and participation attached collectively as **EXHIBIT G**. Addressing these same struggles, he also volunteered for and completed course work administered by the Criminal Offender Reform Establishment (CORE). See Letters of Recognition attached collectively as **EXHIBIT H**.[6]

The Guilty Plea

Mr. Radulescu was charged in four counts of the indictment. Specifically, he was charged with conspiracy to commit access device fraud in violation of 18 U.S.C. §1029(b)(2) (count one); conspiracy to commit wire and bank fraud in violation of 18 U.S.C. §1349 (count two); aggravated identity theft in violation of 18 U.S.C. §§1028A(a)(1) and 1028A(b) (count three) and access device fraud in violation of 18 U.S.C. §1029(a)(1), (b)(1) (count four). Prior to trial, Mr. Radulescu was offered a guilty plea to counts two and three of the indictment with a stipulation to the following

---

[6]

Attached also as **EXHIBIT I** are various, other, certificates of achievement.

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 7


Guidelines calculation:

<u>Count Two</u>
Base offense level (§2B1.1(a)(1)). . . . . . . . . . . . . 7
Loss of more than $1,500,000 (§2B1.1(b)(1)(I)) . . . . . +16
More than 10 victims (§2B1.1(b)(2)(A)) . . . . . . . . . +2
Use of access device equipment (§2B1.1(b)(11)) . . . . . +2
Acceptance of responsibility (§3E1.1). . . . . . . . . . -3

Total adjusted offense level . . . . . . . . . . . . . 24

<u>Count Three</u>
Statutory consecutive punishment . . . . . . . 24 months.

Thus, under the proposed agreement, Mr. Radulescu, in criminal history category I, faced a range of imprisonment of 75 to 87 months.

Mr. Radulescu rejected the plea offer under the belief that he was not guilty of count three, aggravated identity theft, because the account numbers and PINs that he stole were not "means of identification" under 18 U.S.C. §1028A(a)(1) and as further defined in 18 U.S.C. §1028(d)(7) and 18 U.S.C. §1029(e)(1). Believing, however, that he was guilty of the remaining counts, on June 23, 2022, he pleaded guilty to them without an agreement with the government. To provide a factual basis for the guilty plea, he stated, among other things: "I agreed with, to work together with a group of people to obtain credit card numbers and PIN numbers of account holders and used them to obtain more than $1,000;" "I have agreed to work with a group of people to devise a scheme in order to defraud the financial institution by obtaining credit and debit card numbers and PINs and use them at the ATM to withdraw money;" and "I have installed skimmer devices on ATM, and we duplicate the information and use it at the ATM to withdraw money" (T. 676; GX 8006). At trial, Mr. Radulescu moved for a judgment of acquittal under Rule 29 because "the government failed to prove that [he] possessed or used the means of identification" noting that the "Second Circuit has not yet held that PIN numbers or account numbers on their own are sufficient to constitute a means of identification" (T. 666). In summation, he also made the argument that: "It is our contention that, stripping away the cooperators' testimony, you do not have sufficient facts to determine that [Mr. Radulescu] committed this crime. In addition, even crediting perhaps some parts of the cooperators' testimony, the government

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 8


has failed to establish that what Mr. Radulescu did involved the theft of a means of identification as that term is defined by statute" (T. 739).


## DISCUSSION

THE GUIDELINES CALCULATION SET FORTH IN THE PSR IS FLAWED AS TO CERTAIN OFFENSE CHARACTERISTICS, THE ROLE ENHANCEMENT AND ACCEPTANCE OF RESPONSIBILITY, AND, AT BOTTOM, MR. RADULESCU SHOULD BENEFIT FROM A SIGNIFICANT DOWNWARD VARIANCE

Pursuant to 18 U.S.C. §3553(a)(2), this Court is required to "impose a sentence sufficient, but not greater than necessary" to comply with generally recognized purposes of sentencing, including the need:

A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

B)   to afford adequate deterrence to criminal conduct;

C)   to protect the public from further crimes of the defendant; and

D)   to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Among other things, the sentencing court is also required to consider: the nature and circumstances of the offense, the history and characteristics of the defendant, the Sentencing Guidelines and the need to avoid unwarranted sentence disparities. 18 U.S.C. §§3553(a)(1), (a)(4), (a)(6).

### The Guidelines

A district court should begin all sentencing proceedings by calculating the applicable Guidelines range. <u>Gall</u> v. <u>United</u>

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 9


<u>States</u>, 552 U.S. 38, 49 (2007).  The Guidelines provide the
"starting point and the initial benchmark" for sentencing.  <u>Id.</u>

     As set forth in the Addendum to the PSR and amplified here,
Mr. Radulescu has objections to the Probation Office's Guidelines
calculation.

### Loss

      The amount of loss is overstated.  Mr. Radulescu does not
challenge the loss amount set forth in paragraph 37, which totals
$2,249,781.58, representing the total loss on skimming jobs in
which he participated.  Such a loss, would result in an enhancement
under §2B1.1(b)(1)(I) of +16.  Mr. Radulescu objects, however, to
additional loss as set forth in paragraph 38 because, in short, he
did not recruit Iordache, Tita did, and Iordache jobs were
committed without notice to or participation by Mr. Radulescu and
thus were not reasonably foreseeable to him.  PSR at 42.

     Regarding the government's response to Mr. Radulescu's
objection, Mr. Radulescu denies that he directed Iordache, in March
2017, to send skimming equipment from Romania to Curtis Valentine.
Furthermore, while true that Tita wanted new recruits to cash out
in Massachusetts and Mr. Radulescu passed on notice of the job
opportunity to Iordache, then in the United States, that scenario
made Tita the primary recruiter, as per Mr. Radulescu's objection.

     It merits noting that the government does not contest Mr.
Radulescu's contention that he had no notice of and did not
participate in the skimming jobs listed in paragraph 38.

     Nothing with regard to Iordache was presented at trial.  To
the extent the Court may consider the losses set forth in paragraph
38, a <u>Fatico</u> hearing is requested.

### Leadership Role

     Mr. Radulescu objects to the 4-level leadership role
enhancement as per §3B1.1.  It is his contention that he was no
more important than anyone else in the skimming jobs, he did not
control others and was not typically, though sometimes, entitled to
a greater share of the profits.  Unlike loss, the leadership
enhancement may be more easily resolved based on the trial record.

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 10


     The government's response to Mr. Radulescu's objection is set
forth in the Addendum (at 41) and includes, almost exclusively,
citations to Aura Voicu's testimony, which cannot be credited.  The
Court is reminded of the following impeachment on cross-
examination, Voicu: lied on her visa application to enter the
United States (T. 581, 604); cooperated in the need for revenge (T.
607); blamed Mr. Radulescu and one other for theft of her skimming
savings, totaling $75,000 (T. 608); "hated" Mr. Radulescu (T. 609);
was testifying also to receive a presidential pardon (T. 610);
wanted Mr. Radulescu to get a "two-digit," meaning at least a ten-
year, term of imprisonment, three times, at least, that of her own
(T. 610); was a "lady" unlike the other inmates who had "no
education, morals and principles" (T. 612); was not "some rude
ghetto, uneducated person" (T. 612); and was paid by the U.S.
government a monthly $6,000 stipend while cooperating, and for her
travel expenses to testify at the instant trial (T. 613-614).  In
short, she presented as unhinged, vindictive, biased and haughty.
The government has rewarded her too handsomely and her presidential
pardon depended on exaggerated testimony of Mr. Radulescu's
activities.  In any event, Voicu only skimmed with Mr. Radulescu
for six months (T. 604-605), in a small and briefly operational
subset of the overall conspiracy.  She is not a witness to rely on,
frankly, at all, but even if she deserves some consideration she
knew far too little of the sprawl of bad actors or Mr. Radulescu's
placement in the hierarchy.

     The Court may find more helpful the following citations.  With
regard to Elena Moldava, she: tested skimming devices (T. 143-44);
installed skimming devices and cameras (T. 117-18); encoded cards
(T. 120); obtained gift cards to be used to encode (T. 122); cashed
out (T. 124); received 20% for cashing out (T. 148);[7] worked with
a man from Spain to create a "magic card" that overrode the daily
limit (T. 159-60); was the romantic partner and constant companion
of the two super-bosses, Florian Claudiu Martin and Constantin
Ovidiu Tita  (T. 177-178); shipped skimming devices (T. 186); moved
money back to Romania (T. 180-181); held money for Martin to be
used to bail out his operators or assist them in immigration
matters (T. 187); and participated in skimming in the United States

---

     [7] Note that, most of the time, Moldovan was not the only cashout
participant.  When you total up the 20% takes for the cashout
participants the profits for those supposedly higher up were about
the same.

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 11

alone for seven years (T. 134).  In both quantity and quality, Mr.
Radulescu's participation was less serious.  Moreover, Moldovan
testified that Mr. Radulescu: did not like her (T. 283); did not
travel with her (T. 283); did not encode with her (T. 283); never
directed her to do anything in regard to skimming or cashing out
(T. 284); and was not her boss (T. 284).  Last, Moldovan made at
least $1,000,000 skimming (T. 285), while Mr. Radulescu earned
$300-400,000 (T. 418, 552).  Under these circumstances, it cannot
fairly be said that Mr. Radulescu was a leader vis a vis Moldovan.

Nor can it be said that he was a leader vis a vis Tita.  Tita
established himself in skimming in the United States in 2011 and
participated in all aspects of skimming jobs (T. 386).  Mr.
Radulescu arrived in 2014 and did not meet Tita until 2016, at
which time he became Tita's underling (T. 417, 551).  Tita met
Nikolaos Limberatos in 2012 (T. 551).  Mr. Radulescu met Nikolaos
Limberatos in 2016 and was his underling, as well, though, briefly,
as Mr. Radulescu did not like Nikolaos Limberatos (T. 162).  With
regard to these other participants, again, it cannot fairly be said
that Mr. Radulescu had leadership status.

### More than $1,000,000 in Gross Receipts

Mr. Radulescu was not personally enriched by more than $1
million through skimming.  Mr. Radulescu was involved for three
years.  He confided to Tita that he made only $300-400,000.  This
was consistent with Moldovan's testimony that she made about $1
million but did so over seven years, and approximately $150-200,000
of her earnings came in one day from the "magic card," which Mr.
Radulescu never possessed.  Further, Mr. Radulescu was only paid
for jobs he in fact participated in and those totaled just
$2,249,781.58.  _See_ ¶37.  He concedes that on the jobs he
participated in he made at least 20%, which is about $400,000, as
he told Tita.  The jobs on which he made more were the exceptions,
not the norm.

In response to Mr. Radulescu's objection to the
§2B1.1(b)(17)(A) enhancement (_see_ ¶72), the government indicated
that Mr. Radulescu participated in skimming operations that yielded
at least $3,270,339.42, without detailing how it came to that
number.  It then arbitrarily chose 30% as Mr. Radulescu's
proportionate share without detailing how it derived that number.
_See_ PSR at 45.  Suffice it to say, the parties can agree that Mr.
Radulescu at least received a 20% share on all skimming jobs.  Even

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 12

using the government's higher number of $3,270,339.42, 20% is well less than $1 million.  In fact, 30% of that figure – the share adopted by the government – is also less than $1 million ($981,101.83).

Again, to the extent the Court may consider the (b)(17)(A) enhancement, a <u>Fatico</u> hearing should be held.

### Sophisticated Means

Mr. Radulescu also objects to the sophisticated means two-level enhancement (§2B1.1(b)(10)(C)).  <u>See</u> ¶72.  Application Note 9(B) provides:

> For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of a scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

None of the skimming participants were experienced engineers or electricians.  Nonetheless, through trial and error and dumb luck, a few of them managed to create low-tech devices and cameras that captured account numbers and PINs on ATM machines.  The cards on which the numbers were encoded were available at CVS (Moldovan just stole them).  Encoding merely required the purchase of a magnetic stripe reader, available off the internet.  And there was certainly nothing difficult about cashing out.  In all, this was a simple, albeit extensive, larceny with some jerry-rigged electronics. There was nothing "especially" complex or intricate.  The conduct at issue does not nearly measure up to the examples provided in the relevant Application Note.

### Acceptance of Responsibility

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 13


        Mr. Radulescu is deserving of a two-level reduction for
acceptance of responsibility as per USSG §3E1.1(a).  See ¶¶64-68,
79.  He pleaded guilty to three of the four counts against him,
admitting the conduct that was the basis for his trial conviction
on the remaining count.  He went to trial on the aggravated
identity count not to contest his conduct but to contest the legal
conclusion that his conduct as set forth during the guilty plea
also made him guilty of aggravated identity theft.  In short, he
did not believe that ATM card numbers and ATM PINs constituted
means of identification under 18 U.S.C. §1028A(a)(1).  See USSG
§3E1.1, App. Note 2 (credit for acceptance of responsibility where
defendant goes to trial to "challenge . . . the applicability of a
statute to his conduct").  See PSR at 43.[8]

        The government's position appears to be that Mr. Radulescu
cannot receive acceptance of responsibility because he pleaded
guilty too late, citing Application Note 1(H).  As to the timing,
I recall conversations with the government well within the time Mr.
Radulescu could have pleaded guilty pursuant to the proposed
agreement with full credit for acceptance, wherein I mentioned that
the only sticking point was his belief that his agreed-to conduct
did not qualify as aggravated identity theft.  As such, he, in
fact, did manifest his acceptance in a timely manner.
Alternatively, the government argues, in essence, that acceptance
is precluded because efforts were made at trial to impeach
government witnesses (presumably cooperators).  As to those

---

[8]    As described above, Mr. Radulescu made sweeping admissions at
his change-of-plea hearing.  Those admissions satisfied all of the
elements of the aggravated identity theft count as explained by the
Court in its final instructions:

                One, that the defendant you are considering
                knowingly transferred, possessed, or used a
                means of identification of someone else.  Two,
                that the defendant you are considering did so
                during and in relation to the conspiracy to
                commit access device fraud charged in Count
                One, and the conspiracy to commit wire fraud
                and bank fraud in Count Two.  And third, that
                the defendant you are considering acted
                without lawful authority (T. 820-821).

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 14


efforts, true enough, but the Rule 29 motion was a straight up attack on the applicability of §1028A to the alleged offense conduct, and that argument was also made in summation (T. ).

Mr. Radulescu is not seeking a third point reduction, acknowledging that he was too late for that, but in all other respects he is deserving of the two-level reduction.

The Nature and Circumstances of the Offense

The Court presided over the trial and is well aware of the offense conduct, and while it was, of course, highly regrettable, the Guidelines overstate the harm. This case did not involve weapons, violence or drugs, as most cases resulting in the total offense level in the PSR do. To the contrary, as stated above, at base, it was a simple larceny.

This case is yet another example of the flawed §2B1.1 Guideline as affecting high-loss cases. Judge Block has addressed this most comprehensively. In United States v. Parris, 573 F.Supp.2d 744 (E.D.N.Y. 2008) (attached as **EXHIBIT J**), Judge Block sentenced the Parris brothers, convicted after trial of securities fraud (with loss estimated at $2.56 million), and witness tampering, to a term of five years' imprisonment, down, by way of a variance from an advisory range of 360 months. In doing so, he made a comprehensive review of other securities fraud sentences nationwide (Exhibit A to the opinion) and came to the conclusion that "[t]hose who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single-digit terms." Id. at 753.

Judge Block was not alone in finding the necessity for a variance in high-loss cases. I list just a few of the most famous examples. John and Timothy Rigas, the father-son team who, as CEO and CFO of Adelphia Communications Corp., respectively, caused investor losses well exceeding $100 million (the government argued that loss should be measured in the billions not the millions) were sentenced to 12 and 17 years imprisonment, respectively. United States v. Rigas, 583 F.3d 108 (2d Cir. 2009). Consider further Richard P. Adelson. For conspiring to overstate his company's financial results thus inflating its stock price, he was responsible for loss of $260 million. Facing life imprisonment, he

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 15


was sentenced to just 42 months' imprisonment.  <u>United States</u> v.
<u>Adelson</u>, 441 F.Supp.2d 506 (S.D.N.Y. 2006).  The Circuit affirmed
the sentence, finding it not unreasonably lenient.  <u>United States</u>
v. <u>Adelson</u>, 301 Fed.Appx. 93, 2008 WL 5155341 (2d Cir. 2008).

      This Court should recognize the absurdity of a guidelines
sentence in this case and, at bottom, Mr. Radulescu should fare
better than the notorious fraudsters cited in the previous
paragraph.

      <u>The History and Characteristics of the Defendant</u>

      Mr. Radulescu suffered an unenviable childhood.  He was sickly
and raised in relatively impoverished circumstances in Bucharest.
His father, Gabriel, was a raging alcoholic, who regularly beat
his wife, Tania, and occasionally beat Mr. Radulescu, too.  Mr.
Radulescu protected his sister and she alone escaped battery.
Gabriel and Tania divorced when Mr. Radulescu was thirteen years
old.  Tania raised her two children in even greater poverty in a
studio apartment.  Because her wages did not cover rent and
expenses, Mr. Radulescu found low-skill jobs and worked 40-hour
weeks to contribute.  As a result, school was secondary and
optional.  He was a habitual truant and, despite his intellectual
capacity, got middling grades.  Though Gabriel was never close to
his children, he and Mr. Radulescu, at thirteen, got into a row and
Mr. Radulescu did not speak to his father from then through his
high school years.

      In short, Mr. Radulescu's boyhood was fraught.  He had a
terrifying male role model and then no male role model at all.  He
was forced into labor to the detriment of an education.  His future
bleak, at 19, Mr. Radulescu turned to drugs.  While there have been
periods of sobriety, Mr. Radulescu has stubbornly abused drugs most
of his adult life.

      On the upside, despite all these foundational setbacks, Mr.
Radulescu has maintained employment since the age of thirteen and
has evidenced core resourcefulness.  Further encouraging is the
change in lifestyle made upon his return to Romania in 2017 and
since.  In 2017, he again got sober, worked first as an Uber driver
and then incorporated a ride-sharing business with some partners.
It does not surprise that he has been offered re-employment in that
field upon completion of his sentence here and removal to Romania.
Further, but for a one-month period of synthetic cannabis use –

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 16

which is forgivable under the high-anxiety of Covid-19 and
lockdowns – he has been a model inmate.  In this regard, I note
especially his work history and class work.  Once again I highlight
the job-performance review attached as **EXHIBIT C**.  It began:
"Inmate does a full day's work and goes above and beyond his
assigned job description . . . . [H]e also gives input on how to do
things better, safer and more efficient."  The review goes on at
some length noting further superlatives.  As to education and
therapy, Mr. Radulescu's participation was extensive.  <u>See</u> **EXHIBITS
D-I**.  The desire to rehabilitate and better himself is manifest.[9]

<u>Unwarranted Sentencing Disparity (18 U.S.C. §3553(a)(6))</u>

Pursuant to 18 U.S.C. §3553(a)(6), district courts must
consider "the need to avoid unwarranted sentence disparities among
defendants with similar records who have been found guilty of
similar conduct."  <u>See</u>, <u>also</u>, <u>Kimbrough</u> v. <u>United States</u>, 552 U.S.
85, 108 (2007).  The main purpose of the statute is to "minimize
nationwide disparities."  Nonetheless, the Circuit does not object
to the district court's consideration of similarities and
differences among co-defendants when imposing a sentence.  <u>See</u>
<u>United States</u> v. <u>Wills</u>, 476 F.3d 103, 110 (2d Cir. 2007).

<u>Nationwide Disparity</u>

Counsel was unable to find a listing of federal sentences
imposed on ATM skimmers.  However, according to the United States
Sentencing Commission 2021 Statistical Information Packet, the most
recently available, in 2021 the national mean and median terms of
imprisonment for fraud/theft/embezzlement offenders was 20 and 12
months, respectively.  In the Second Circuit, the mean and median
terms of imprisonment were 17 and 6 months, respectively.  And, in
the Southern District of New York, the mean and median terms of
imprisonment were 20 and 12 months, respectively.

The disparity between these terms of imprisonment and that

---

[9]
Without fully briefing the matter and thereby appending the
string cite of cases in which Courts have granted downward
variances for the harsh conditions of confinement during Covid-19,
Mr. Radulescu asserts that said conditions warrant a downward
variance in his case as well.

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 17


suggested by the guidelines and even as recommended by the
Probation Office for Mr. Radulescu is eye-popping.

        Co-Defendant Disparity

     As originally charged, there were at least thirty defendants
under the instant indictment.  For plea negotiations, as I
understood, the government broke down the defendants into three
tiers.  Tier I, representing the least culpable who only cashed
out, was given plea offers to the aggravated identity count,
resulting in two years' imprisonment.  Tier III, representing the
most culpable because they operated their own jobs without
direction from others, was required to plead guilty to the
conspiracy to commit wire and bank fraud and aggravated identity
theft.  Tier II, representing everyone of in-between culpability,
was permitted to plead guilty to the conspiracy to commit wire and
bank fraud only.  As I further understood, loss was tailored to
jobs in which the defendant personally participated.

     As set forth on pages 9-13 of the PSR, only three Tier III
defendants pleaded guilty:  Claudiu Constinel Mihai, Alin Hanes
Calugaru, and Florian Claudiu Martin.  Mihai was sentenced to 54
months' imprisonment with no supervised release to follow and
$861,900.81 to pay in restitution.  PSR at 12.  That represents
the lengthiest prison term to date.  Calugaru and Martin have not
yet been sentenced.  PSR at 9, 11.

     In Tier II, the prison terms imposed ranged from 47 down to 26
months, the supervised release terms ranged from 3 years to none
and the restitution ranged from approximately $3.4 million down to
$360,000.  At the high end was Theofrastos Lymberatos.  He was
sentenced to 47 months' imprisonment, three years supervised
release and more than $3.4 million in restitution.  At the low end
was Gabriel Orzanica, who was sentenced to a term of imprisonment
of just 26 months, with no supervised release to follow, and
$359,043.02 in restitution. PSR at 13.  The sentences for Valentin
Petrescu, Alexandru Iordache, Cristian Ulmanu, George Caceras
Ortmeier and Raul Ionut Vidrasan fell within these outliers in more
or less descending order of severity.

     The government has always maintained that Mr. Radulescu was a
Tier III defendant, and, of course, he went to trial on the
aggravated identity theft count for which, the government and the
Probation Office contend, he is undeserving of any credit for

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 18


acceptance of responsibility.  The government and the Probation
Office believe that Mr. Radulescu's total offense level is 39 under
counts one, two and six, resulting in a range of imprisonment of
262-327 months – based in part on loss of $3,270,339.42 – followed
by 24 months on count three, for a total range of 286-351 months.
PSR at 24-25, 33.

     Recognizing that Mr. Radulescu went to trial (but as noted
only on one count and only to test the reach of the statute) and is
therefore not exactly similarly situated to Mihai, still any
sentence within the 286-351 range would disparate.  Indeed, even
the Probation Office's recommended sentence of 144 months (PSR at
47, 50) is exceedingly harsh.   While I do not know the manner in
which the 54-month term of imprisonment was reached for Mihai, if
it were a straight guideline sentence that would fall within a
total offense level of 23 (assuming CHC I).  Adding three-levels
for no acceptance of responsibility, the total offense level for
Mr. Radulescu, who is otherwise similarly situated, would be 26,
which carries a range of imprisonment of 63-78 months.  The
Probation Office's recommendation is more than double the bottom of
this range.  Moreover, the recommendation is  roughly triple the
terms imposed on Tier II defendants, many of who were extensively
involved as noted by the restitution orders imposed.  See United
States v. Esso, 2012 WL 2401683 (2d Cir. 2012) ("In light of the
district court's failure to explain why Esso received a longer
sentence than Persaud despite Esso's lesser culpability, and the
fact that the two were similarly situated in numerous respects,"
sentence vacated).

     The Parsimony Clause

     Based on all of the above, including Judge Block's concerns in
high-loss cases and the term for Mihai, the best comparator, of
just 54 months, a term of imprisonment for Mr. Radulescu of 63-78
months, or thereabouts, seems appropriate.  Such a term would be
sufficient but not greater than necessary to "reflect the
seriousness of the offense, to promote respect for the law, and to
provide just punishment."  See 18 U.S.C. §3553(a)(2)(A).  Such a
term will adequately deter criminal conduct by others as it would
be in keeping with the sentences already imposed in this case and
is far in excess of the national, Second Circuit, and Southern
District of New York mean and median terms imposed on fraud
charges.  Id. at (a)(2)(B).  At 36 years old, this is Mr.
Radulescu's first offense, he will be removed following service of

Hon. Sidney H. Stein
United States District Judge
November 10, 2022
Page 19


his term of imprisonment, and there is no reason to believe he will
re-offend.  The need for personal deterrence, thus, does not compel
a greater term of imprisonment.  Id. at (a)(2)(C).  Finally, Mr.
Radulescu has availed himself of a great deal of the relevant
education and training that the local detention centers, especially
during Covid-19, were able to provide.  It can fairly be assumed he
will continue to do so during the balance of his term (roughly
three years if this recommendation is accepted).  No further
programming would seem helpful or necessary. Id. at (a)(2)(D).  As
such, a term of imprisonment, of 63-78 months, or thereabouts,
would comply in all respects with the Parsimony Clause.


                         Respectfully submitted,



                         James M. Branden


Encs.

# EXHIBIT A

The Honorable Sidney Stein
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007-1312

## Letter of intent to hire

Dear judge,

I used to work with Mr. Alexandru Radulescu, previous his arrest, and based on relevant good work experience I had with him, I would like to offer him employment as a collaborator on our ride sharing firm.

As he already proved in the past, that he is serious, hard working, has good communication skills and some experience in this domain, we would like to welcome him to joins us, as soon he will be released and back to Romania.

Respectfully, Mihai Mihalache

Signature:

Date:09/12/2022

Bld Unirii Nr.57 Bl.E4 Et.5 Ap.84
Sector 3 Bucuresti

Translated by Google from Romanian:

Dear Mr. Judge, I have known Alexandro since he was born, being my cousin from my mother's side. He is a person dear to my soul, an altruistic and empathetic person, the person you can rely on in any situation. When his parents divorced, he and his sister stayed with their mother. Since then, he took on the role of protector and supporter for them, even though he was at a young age. But this did not prevent him from being a fighter and a winner. To fight even if the situation was not always easy. It was like a man in a child's body. He always found words to lift the spirits of his sister and mother. Later, when the situation allowed, he undertook to later help his mother morally, as well as financially, as she was the only one with an income at the time Alexandro is a positive, hardworking and gentle person. He has always been a loving man considering his relationship with my children, both of whom grew up close to him. He offered them a shoulder to cry on, a helping and trustworthy hand. We often remember how he made us laugh, his good energy and his pure soul. To show you the beauty of his soul, I can highlight 2 examples: He helped and guided a cousin of his, when he needed it the most. This child's relationship with his parents was very cold, and because of this, he had taken the wrong path. (drinking, scandals, etc.), becoming a frustrated, rebellious person, without a purpose in life. Alexandro helped him to find himself, to develop personally, thus becoming like a brother to him and making him understand that life can be lived differently. The second example is myself... I was diagnosed with breast cancer. Alexandro was the one who supported me and helped me morally. Throughout the preoperative treatments (chemotherapy and radiotherapy), he was a constant presence in my life. On a moral level, considering the distance and the limitation of communication, he did his best to take an interest in my physical and mental condition, praying for me and at the same time asking his friends to take an interest in me and help me, in his absence, with everything they can. The impact he had on me, the family, when he deprived us of his presence, cannot be described in words... Pain, bitterness, sadness are some of the states we all had. try all the feelings of disappointment, frustration, pain. You give in mentally and your heart hardens. Regardless of the degree of kinship, it is a very painful situation. I, like my children, suffer from his presence, we find it very difficult to adjust without him. We miss him a lot. The situation is also difficult for Alexandru. Far from family, friends, loved ones, alone among strangers, only him with his thoughts, with his questions, with his fears but also with the hope that everything will end. As a human being, in order to survive, you need people to help you, to give you a touch of hope, positivity and love. You need a lot of strength to be able to overcome such an episode. I trust Alexandru, I am with him and I support him. 11 I will help with everything possible. Because he deserves this. Because he is the man who would give his soul for the good of his neighbor. Every man would yearn for an Alexander in his life. I hope with all my heart that this letter will be useful to him and that it will characterize Alexandru in the most natural way, and I thank you for this opportunity.

Sincerely, Simona Voica

Translated by Google from Indonesian:

Introducing my name is Rosanni, usually called Rosa. I have a husband, a son and two daughters. Alex and I are friends. I started my introduction to alex in 2012. I met alex at a restaurant in the Jakarta area. Then then Alex and I continued our communication through chat media, telephone or met at a restaurant to eat and share stories. As long as we were friends in Indonesia, sometimes I went to his house or Alex came to visit me at my house and met my family. Alex and my children get on very well. Especially my youngest child who was 3 years old at the time and happened to be quite fluent in English so they could communicate easily. Alex and my youngest child, Stephanie, are quite close because Alex loves children. I consider alex like my brother or my sister. Alex is also quite close to my family. When me and alex were sharing stories, alex talked a lot about his mother, sister and country of origin. He showed me a picture of his family and his girlfriend at the time. I am happy to be friends with him because he is polite and kind. Also alex thinks of me as a smart and strong woman he said. Also I often get compliments from alex that I am a good mother to my family. As long as we were friends in Indonesia in sharing many things, I never asked about his job or status. I've never asked something like that when we were friends, not lovers. For me, enough to be friends without having to ask about privacy matters but if he tells me listen. Alex often entertained me about his experiences. He also told me funny jokes. He was patient to keep in touch with me even though my English was not good. I have never forgotten how he set the tempo of his speech so that I could understand what he was saying. There are many lessons that I can take from Alex, especially how he loves his mother and family. He shared that his mother was a strong woman and how she fought for Alex and his sister. Alex also shared that his father left him at a young age and his mother had to work in two places to meet household needs. My eldest son, Jeremy, is also quite close to Alex because my son was already a teenager at that time, so Jeremy could talk more freely with him than with me. The two of them even have their own nicknames, Jeremy calls him "Mr. Slim" and Alex calls Jeremy "Mr. Fancy". Apart from eating, if me and my kids have free time and Alex also has free time the five of us sometimes go to the cinema to watch movies. There was also one time where the five of us went to Tidung Island to have 2 days of recreation there. On Tidung Island we stayed for two days, doing snorkeling and many other water sports. My family has known him for almost two years. Then in 2014, he returned to his

native Romania. Since then my family and alex communication only through whatsapp. There is a funny thing that to this day has not escaped my mind, namely about the alarm. Sometimes Alex and I talk at the DJakarta Cafe restaurant which is a '24 hours restaurant. I always set the alarm at 2 am and there was one moment when we were talking at the restaurant he asked why I activated the alarm at 2 am. Then I replied that it was an alarm to remind the time to pray. So after that time every time we talked until late in the morning and my alarm went off alex reminded me to pray with "ma.mi Rose,- its time to pray". He called me "ma.mi rose" because my children call me the same way as "mami rose" to. My communication with him took place in late 2018, then in 2019 and finally in 2022. Despite the problems he is currently facing, while in Indonesia I have never heard bad news about him. Because as long as we talk at cafes or restaurants, what he tells is only funny things or news about his family's development. In early 2022, alex's friend told me that alex was in prison. I was shocked and saddened to hear the news. I never asked why and the reason he was imprisoned but I chose to give moral support and give news about me and my family who are in good condition to encourage him and I also tell alex to be patient and keep thanking God for whatever happens in this life. Then at that time Alex told me about his life journey while in prison. He told me that he often read books, he even said he could finish One book in 4 days. He also shared that he often helped his friend in the prison kitchen. Then he also told me that he also keeps exercising. The stories he told during his imprisonment made me even more excited to read the Bible and work harder for my family. I will always remember him as a good friend. I hope the case that he experienced can be passed as well and as quickly as possible. So that he can return to see his mother and his family can also work again. I also hope that his journey while in prison will make him a better individual when he is released. Best regards from me and my family to those who will read this letter. Also best regards to Alex.

August 22, 2022

The Honorable Sidney H. Stein
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl St.
New York, NY   10007-1312

Ref:  Alexandru Radulescu

Dear Judge Stein:

 I am writing to you regarding a friend who you are about to sentence.   His name is Alexandru Radulescu and he is Romanian.   He is 36 years old and I have known him for about half of his life.   I am not related to him or any more than just his friend.

I will introduce myself.   I am 80 years old and have lived in New Jersey and New York all of my life.   I never visited Romania.   I have an AB in Math and MS in Computer Science from Rutgers. As a Bank Vice President, I installed one of the first bank main frame computers in NJ and also some of the first ATM's.   For this reason, I understand the offenses that are involved.

I met Alex in an online chatroom and we talked about computers.   He impressed me with his knowledge and after 3 years he indicated that he wanted to start a business in tourism so I invited him to come to New York and stay with me to learn about this country.   He obtained a visa and arrived in 2014.   As far as I know, and I have checked with his friends, he never intended to be involved in crime when he arrived with me.    After a few weeks, he was recruited at a restaurant on my street by another Romanian-American into this crime activity because of his computer skill.    When I learned of this, I evicted him from my building.  (I am the President of my CO-OP).   I advised him to stop but he was beyond my control.

Alex is a very kind person.   He always helped me while living with me but he never quite realized the damage that he was doing to others with his crimes.    As I read the trial transcript, I saw that he and others believed that they were only harming banks who were insured by some federal insurance fund.    I had to educate him on that misconception in the last few weeks with a slogan that I coined - 'Grandma cannot get her med's – good bye Grandma'.   This horrified him.   I believe that Alex is basically a good person who was never in trouble in his home country but was brought up just as Communism left Romania and was very poor.   He was an easy recruit at a young age.

Page 2  Radulescu

I would like to respectfully request that after you consider what I have told you here, and after minimum and consecutive sentencing guidelines are followed, and after the near 35 months he has waited for trial because of Covid, that you consider suspending a portion of whatever sentence you decide on with the proviso that he never return to this country.   He has learned his lesson in a very dangerous environment in the Federal Prison in Brooklyn and perhaps taxpayer money can be saved by not having us pay for a lengthy incarceration.

Respectfully,

Lee A. Duxbury

4415 43rd Ave., Apt.  4-M

Sunnyside, Queens, NY  11104

/ld

**EXHIBIT B**



# UNITED STATES GOVERNMENT
## MEMORANDUM

**Metropolitan Correctional Center, New York, New York**

| | |
|---|---|
| **DATE:** | **June 5, 2021** |
| **FROM:** | **M. Charles / Food Service Cook Supervisor** |
| **SUBJECT:** | **RADULESCU #87932-054** |

To whom it may concern:

This is to confirm that Inmate Radulescu#87932-054 has been working in the food service department from JULY 2020 to present. Radulescu has worked as the line server/dish machine operator and works directly under my supervision. He also helps us with the preparation of all meals prepared in the Food Service Department at the Metropolitan Correctional Center (MCC NY). He is very professional at work, an extremely hard worker, and he puts all his efforts to get the job done in the given time. If you have any question please feel free to call me at (646)-836-6404.

Thank you for your time.

M. Charles,
Cook Supervisor

# UNITED STATES GOVERNMENT
## MEMORANDUM

**Metropolitan Detention Center, New York, New York**

| | |
|---|---|
| **DATE:** | **December 18, 2021** |
| **FROM:** | **M. Charles / Food Service Supervisor** |
| **SUBJECT:** | **RADULESCU #87932-054** |

To whom it may concern:

This is to confirm that Inmate RADULESCU, #87932-054 has been working in the food service department from November 2021 to present as one of our head bakery cooks for 1650 inmates. RADULESCU has been assigned the duties of head bakery, however he also helps out doing the following: butcher, dining and dish machine worker, line worker and pot and pan washer. Inmate Radulescu is learning how all the positions contribute to the overall success of the department and works directly under my supervision.   He also helps us with sanitation to include cleaning industrial ovens, steam kettles, organizing the warehouse, refrigerators, freezers and oven warmers.

He is very professional at work, an extremely hard worker, and he puts all his efforts to get the job done in the given time. If you have any question please feel free to call me at (718)-840-4200.

Thank you for your time.

M. Charles

**EXHIBIT C**

BP-S324.052 **WORK PERFORMANCE RATING - INMATE** CDFRM
OCT 98
**U.S. DEPARTMENT OF JUSTICE**                                                     **FEDERAL BUREAU OF PRISONS**

| Inmate's Name Radulescu, Alexndru | Register No. 87932-054 | Unit |
|---|---|---|
| | | Jc |

| Evaluation Period 3-8-2022 TO Present | Work Assignment Unit Orderly |
|---|---|

Inmate does a full day's work and Goes above and beyond his assigned job description. Inmate Radulescu.is assigned to the JC unit at MDC Brooklyn. Inmate Radulescu. also gives input on how to do things better, safer and more efficient. Inmate Radulescu ensures that the inmates are following the CDC guidelines and institutional guidelines to make sure that the unit is safe for staff and inmates. He drives himself exceptionally well. Inmate Radulescu is a true leader and he performs his duties well and is always willing to take on additional duties. Inmate Raulsecu is assigned as a daily cleaner on the unit, he serves food and maintains the inmate laundry he works well with staff and other inmates. Inmate is Radulescu is always willing to take on additional task as needed. Inmate Radulescu is also very helpful on the unit. The work assignment inmate Radulescu is vital for keeping the unit clean during the pandemic. Inmate Radulescu is one of the more reliable inmate workers on the unit he is always willing to train other inmates and he is an example of what true leadership is all about.

---

Route to Dept. Head for Review, Then to Unit Team

---

Instructions: Circle the best statement in each area.  Base your rating on the inmate's overall performance for the rating period--neither the inmate's best day nor worst day--as compared to what is expected of a satisfactory worker in the assignment.

**A. QUALITY OF WORK.THE X IS STANDS FOR THE RATING THE INMATE RECEIVED.**
  l. Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
  2. Fair. Careless; makes mistakes and does not check work. Should do better work.
  **3**. Satisfactory. Makes some mistakes but no more than expected at this level.
  4 Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
  X. Outstanding. Does superior work

**B. QUANTITY OF WORK**
  1. Unsatisfactory. Lazy, wastes time, goofs off.
  2. Fair. Does just enough to get by. Has to be prodded occasionally.
  **3** Satisfactory. Works steadily but does not push self.
  4. Good. Willing Worker. Does a full day's work and wastes little time.
  X. Outstanding. Drives self exceptionally hard all the time.

**C. INITIATIVE**
  l. Unsatisfactory. Always waits to be told what to do. Needs help getting started.
  2. Fair. Usually relies on others to say what needs to be done.
  **3**. Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
  4. Good. Can plan own work well. Acts on own in most things.   Doesn't wait to be told what to do.
  X. Outstanding. Has good ideas on better ways of doing things.

**D. INTEREST; EAGERNESS TO LEARN**
  1. Poor. Shows no interest in job. Regards job as a drag or waste of time.
  2. Fair. Shows minimal interest but not very eager to learn.
  **3**. Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
  4. Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
  X. Outstanding. Eager to master job. Wants to know everything there is to know about it. May read up on own time or volunteer to do things that will improve knowledge.

**E. ABILITY TO LEARN**
  1. Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction unable to learn, no matter how hard trying.
  2. Fair. Slow but if tries eventually will pick up the skills. Needs more instructions than most.
  3. Average. No slower and no faster to learn than most inmates.   Requires average amount of instruction.
  4. Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
  X. Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

**F. NEED FOR SUPERVISION; DEPENDABILITY; SAFETY; CARE OF EQUIPMENT**
  l. Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off.
  2. Needs closer supervision than most. Not very dependable.
  **3**. Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
  4. Needs little supervision. Good record of dependability and promptness.
  X. No supervision required. Completely dependable in all things.

(This form may be replicated via WP)                                          Replaces BP-S324, OCT 94

**G. RESPONSE TO SUPERVISION AND INSTRUCTION**
   1. Poor. Resentful and hostile. May argue with supervisor.
   2. Fair. Resists or ignores suggestions.
   **3.** Satisfactory. Generally does what is told without any fuss.
   4. Good. No hostility or resentment. Tries to improve.
   X. Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

**H. ABILITY TO WORK WITH OTHERS**
   1. Poor. Negativistic, hostile, annoying to others.
   2. Fair. Doesn't make friends easily. Has some interpersonal difficulties.
   **3.** Satisfactory. Gets along OK with most co-workers and is accepted by them.
   4. Good. Friendly, congenial, helpful; others like to work with.
   X. Outstanding. Gets along well with everyone. Very popular.

**I. OVERALL JOB PROFICIENCY**
   Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:

   1. Fire or lay off that individual?
   2. Transfer the person to a less demanding job at a lower pay scale?
   **3.** Continue to employ the person but without a raise or promotion this time?
   4. Raise the person's pay but keep the person at the same job?
   X. Promote the person to a more demanding job at a higher pay rate?

**J. GRADES AND PAY**
   1. Performance Pay - Grade Class (Circle one) 1 - 2 - 3 - 4 - M.

   2. Hours of Satisfactory work_____160_____ .

   3. Regular Pay _____$19.20_____ .

   4. Bonus Recommended:__ yes;__

   5. Total Pay _____$19.20_____ .

| Supervisor's Signature   S. Benner | Date   8-28-22 |
|---|---|
| Inmate's Signature | Date |

Inmate _____ was requested to sign this rating, but refused, citing the following reason:

| Staff Witness' Signature | Date |
|---|---|

# EXHIBIT D

```
   BROHU          *        INMATE EDUCATION DATA       *       08-16-2022
   PAGE 001 OF 001 *             TRANSCRIPT            *       08:43:29

   REGISTER NO: 87932-054    NAME..: RADULESCU            FUNC: PRT
   FORMAT.....: TRANSCRIPT    RSP OF: BRO-BROOKLYN MDC

   ------------------------- EDUCATION INFORMATION --------------------------
   FACL ASSIGNMENT DESCRIPTION            START DATE/TIME STOP DATE/TIME
   BRO  GED UNK    GED STATUS UNKNOWN     03-16-2020 1804 CURRENT

   -------------------------- EDUCATION COURSES ----------------------------
   SUB-FACL   DESCRIPTION                START DATE  STOP DATE EVNT AC LV  HRS
   BRO M      CARD MAKING                05-02-2022 05-29-2022  P   C  P     5
   BRO M      DIABETES                   05-02-2022 05-06-2022  P   C  P     3
   NYM M      YOGA CLASS 1               07-12-2021 07-21-2021  P   C  P     6
   NYM M      EMPLOYMENT INTERVIEWS      05-14-2021 05-14-2021  P   C  P     1
   NYM M      JOB SEARCH SKILLS          05-14-2021 05-14-2021  P   C  P     1
   NYM M      FINANCIAL LITERACY 1       05-14-2021 05-14-2021  P   C  P     3
   NYM M      FDIC MONEY SMART SKILL 3   05-13-2021 05-13-2021  P   C  P     3
   NYM M      FDIC MONEY SMART SKILL 2   05-12-2021 05-12-2021  P   C  P     3
   NYM M      FDIC MONEY SMART SKILL 1   05-11-2021 05-11-2021  P   C  P     3
   NYM M      QUARANTINE ONLINE SAFETY   07-07-2021 07-08-2021  P   C  P     3
   NYM M      BUSINESS ETHICS            06-28-2021 07-02-2021  P   C  P    12
   NYM M      LEADERSHIP AND INFLUENCE   06-21-2021 06-25-2021  P   C  P    12
   NYM M      BUDGET & FINANCE REP CORP TRAI 06-14-2021 06-17-2021  P   C  P    12
   NYM M      BASIC BOOKKEEPING          06-07-2021 06-11-2021  P   C  P    12
   NYM M      10 SOFT SKILLS YOU NEED    06-01-2021 06-04-2021  P   C  P    12
   NYM M      BUSINESS ACUMEN CORP TRAINING 05-24-2021 05-28-2021  P   C  P    12
   NYM M      SALES FUNDAMENTALS CORP TRAIN 05-17-2021 05-21-2021  P   C  P    12
   NYM M      QUARANTINE EARTH SCIENCE   07-08-2021 07-09-2021  P   C  P     3
   NYM M      QUARANTINE EMAIL BASICS    07-07-2021 07-08-2021  P   C  P     3
   NYM M      QUARANTINE SMALL BUSINESS  07-06-2021 07-07-2021  P   C  P     3
   NYM M      QUARANTINE OUR SOLAR SYSTEM 05-10-2021 05-11-2021  P   C  P     3
   NYM M      QUARANTINE U.S. HISTORY    05-03-2021 05-07-2021  P   C  P     8
   NYM M      TIME MANAGEMENT CORP TRAIN 04-19-2021 04-26-2021  P   C  P    12
   NYM M      CONFLICT RESOLUTION CORP TRAIN 04-20-2021 04-27-2021  P   C  P    12
   NYM M      ENTREPRENEURSHIP           02-22-2021 02-26-2021  P   C  P    12
   NYM M      MARKETING BASICS CORP TRAIN 02-15-2021 02-19-2021  P   C  P    12
   NYM M      CARD MAKING LEISURE CLASS  01-13-2021 02-08-2021  P   C  P     5

   G0000        TRANSACTION SUCCESSFULLY COMPLETED
```

# EXHIBIT E

**Bureau of Prisons**          **\*\*SENSITIVE BUT UNCLASSIFIED\*\***
**Psychology Services**
**NRDAP - Administrative Note**

| Inmate Name: | RADULESCU, ALEXANDRU | | | | Reg #: | 87932-054 |
|---|---|---|---|---|---|---|
| Date of Birth: | 04/13/1986 | Sex: | M | Facility: BRO | Unit Team: | J |
| Date: | 07/22/2022 19:44 | Provider: | Barrett, N. DTS | | | |

**Comments**

RADULESCU is an A-HLD inmate at BRO who submitted an electronic request to DAP Svcs to re-enroll in the NR DAP.

Having completed the NR DAP while at NYM, RADULESCU is currently in NR COMP status. He is able to re-enroll at BRO; however, he will not be awarded additional program completion incentives. RADULESCU was notified of the same; he acknowledged conditions of re-enrollment and confirmed interest in participation.

Pursuant to request, RADULESCU will be re-enrolled in an upcoming NR DAP treatment cycle scheduled to start this August on his assigned housing unit. RADULESCU was apprised of the same; view attachment.

Completed by Barrett, N. DTS on 07/22/2022 19:52

# *ACCI Lifeskills*

certifies that

## ALEXANDRU RADULESCU

has successfully completed the

## MARIJUANA AWARENESS COURSE

**Agency:** Metropolitan Detention Center, Brooklyn MDC
**Completion Date:** Dec 28, 2021
**Case Number:** 87932054









**Authorized Signature**

Certificate Key: b8bd7350-39b8-11ec-a431-29b0a1122edd

# ACCI Lifeskills

certifies that

## ALEXANDRU RADULESCU

has successfully completed the

## SUBSTANCE ABUSE COURSE

**Agency:** Metropolitan Detention Center, Brooklyn MDC
**Completion Date:** May 26, 2022
**Case Number:** 87932054





*Kyli Richins*
—————————————————
Authorized Signature



Certificate Key: b8bd7350-39b8-11ec-a431-29b0a1122edd



# DRUG ABUSE TREATMENT PROGRAM

## CERTIFICATE OF COMPLETION

This is to certify that

# Radulescu, Alexandru

has completed
**Drug Abuse Treatment Program**

**This certificate is hereby issued this 30ᵗʰ day of June, 2021.**

M. Johnson, LMSW
M. Johnson, LMSW
Drug Treatment Specialist

Avena, PsyD
rug Abuse Program Coordinator

# EXHIBIT F

**Bureau of Prisons**
**Psychology Services**
**Independent Study**

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | RADULESCU, ALEXANDRU | | | | Reg #: | 87932-054 |
| Date of Birth: | 04/13/1986 | Sex: | M | Facility: BRO | Unit Team: | K |
| Date: | 12/15/2021 11:44 | Provider: | Johnson, Min Kyoung MA, DTS | | | |

**Comments**

Since Mr. Radulescu expressed his interest in initiating the independent study, he was provided with NA/AA Step 1. He will be provided with Step 2 to continue his independent study when he indicates interest.

Completed by Johnson, Min Kyoung MA, DTS on 12/17/2021 06:55

**Bureau of Prisons**
**Psychology Services**
**Independent Study**

**SENSITIVE BUT UNCLASSIFIED**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | RADULESCU, ALEXANDRU | | | Reg #: | 87932-054 |
| Date of Birth: | 04/13/1986 | Sex: | M    Facility: BRO | Unit Team: | K |
| Date: | 01/13/2022 13:10 | Provider: | Johnson, Min Kyoung MA, DTS | | |

**Comments**

The writer met with Mr. Radulescu to discuss and explore his reflection on the provided materials. Mr. Radulescu reported that he has been trying to deepen his relationship with "Higher Power" to manage his cravings. Mr. Radulescu was provided with Step 2 and will be provided with Step 3 when he indicates interest.

Completed by Johnson, Min Kyoung MA, DTS on 01/18/2022 09:14

**Bureau of Prisons**
**Psychology Services**
**Independent Study**

**SENSITIVE BUT UNCLASSIFIED**

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | RADULESCU, ALEXANDRU | | | | Reg #: | 87932-054 |
| Date of Birth: | 04/13/1986 | Sex: | M | Facility: BRO | Unit Team: | K |
| Date: | 02/01/2022 09:41 | Provider: | Johnson, Min Kyoung MA, DTS | | | |

## Comments

The writer met with him to discuss and explore his thoughts on the provided materials. Mr. Radulescu reported that the provided material was helpful and interesting and evoked him to think about his addiction differently. He was provided with Step 3 and will be provided with Step 4 when he indicates interest.

Completed by Johnson, Min Kyoung MA, DTS on 02/02/2022 09:55

**Bureau of Prisons**
**Psychology Services**
**Independent Study**

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| Inmate Name: | RADULESCU, ALEXANDRU | | | | Reg #: | 87932-054 |
|---|---|---|---|---|---|---|
| Date of Birth: | 04/13/1986 | Sex: | M | Facility: BRO | Unit Team: | J |
| Date: | 06/21/2022 15:00 | Provider: | Barrett, N. DTS | | | |

**Comments**

RADULESCU continues to engage in independent study through DAP Svcs utilizing "The Narcotics Anonymous Step Working Guide". Per request, he was provided Step 4 "We made a searching and fearless moral inventory of ourselves." Supportive counseling was not provided but is available upon request. RADULESCU was advised of the same and informed Step 5 will be provided when he indicates interest.

Completed by Barrett, N. DTS on 06/29/2022 18:34

**Bureau of Prisons**
**Psychology Services**
**Independent Study**

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| Inmate Name: | RADULESCU, ALEXANDRU | | | | Reg #: | 87932-054 |
|---|---|---|---|---|---|---|
| Date of Birth: | 04/13/1986 | Sex: | M | Facility: BRO | Unit Team: | J |
| Date: | 07/20/2022 14:10 | Provider: | Barrett, N. DTS | | | |

**Comments**

RADULESCU continues to engage in independent study through DAP Svcs utilizing "The Narcotics Anonymous Step Working Guide". Per request, he was provided Step 5 "We admitted to God, to ourselves, and to another human being the exact nature of our wrongs." Supportive counseling was not provided but is available upon request. RADULESCU was advised of the same and informed Step 6 will be provided when he indicates interest.

Completed by Barrett, N. DTS on 07/22/2022 15:46

**EXHIBIT G**

**Bureau of Prisons**
**Psychology Services**
**Group Participation**

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | |
|---|---|---|---|---|
| **Inmate Name:** RADULESCU, ALEXANDRU | | | **Reg #:** 87932-054 | |
| **Date of Birth:** 04/13/1986 | **Sex:** M | **Facilitator:** (P)Barrett, N. DTS | | |
| **Date:** 08/03/2022 | **Group Facility:** BRO | **Group Title:** [187] J73 NR DAP | | |

**Status:** Enrolled

**Enroll Date:** 08/03/2022   **End Date:**

**Total Hours:** 4.33

## SESSION DATA:

**Number of Sessions:** 3   **First Session Date:** 08/03/2022   **Last Session Date:** 08/17/2022

| Date | Title | Duration | Attendance | Participation | Homework |
|---|---|---|---|---|---|
| 08/17/2022 | Stages of Change | 90 | Complete Session | Good | Satisfactory |
| 08/12/2022 | Introducing Strategies for Change | 80 | Incomplete Session Not | Good | Unsatisfactory |
| 08/03/2022 | Informed Consent, Rapport Building | 90 | Complete Session | Good | Not Apply |

| Attendance | | Participation | | Homework | |
|---|---|---|---|---|---|
| Complete Session Present | 66.7 % | Good | 100.0 % | Not Apply | 33.3 % |
| Incomplete Session Excused | 0.0 % | Fair | 0.0 % | Satisfactory | 33.3 % |
| Incomplete Session Not Excused | 33.3 % | Poor | 0.0 % | Unsatisfactory | 33.3 % |
| Absent Excused | 0.0 % | Not Apply | 0.0 % | | |
| Absent Not Excused | 0.0 % | | | | |

# *Certificate of Completion*

Metropolitan Detention Center, Brooklyn
Brooklyn, New York

*This certifies that:*

## **Alexandru Radulescu**

### **Reg. No. 87932-054**

## *has satisfactorily completed*

## ***My Healthy Thinking Workbook***

*and is hereby awarded this certificate, this 25th day of August, 2022*

Dr. L
Staff Psychologist

# My Healthy Thinking

## Co-occurring Conditions
### An Integrated Approach

This Journal provides a space to record your thoughts, feelings and insights on what you learn in this program.

The process of *Interactive Journaling*® will serve you best when you are open and honest with your responses. Instead of worrying about neatness, handwriting or spelling, focus on the accuracy of your statements and the honest expression of your feelings. Feel free to use open space and margins to complete your thoughts.

You can personalize the information in this Journal to your own circumstances. Ask, "What does this mean to me?" and "How can I apply this to my life today?"

This is your Journal. Your thoughtful responses support your efforts toward a healthy life.

In this Journal, you will explore where thoughts come from, how to recognize risky thoughts and strategies to practice healthy thinking.

| 3-8 | A Closer Look at My Thoughts |
| 9-15 | Eight Risky Thoughts |
| 16-23 | Strategies for Healthy Thinking |

**Name** 87932054 RADULESCU ALEXANDRU

**Date** 05/15/2022



Featuring the Interactive Journaling® process

**© 2021 The Change Companies®**

All rights reserved. Printed in the United States of America. No part of the material protected by this copyright may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording or by information storage and retrieval system without written permission from the copyright owner.

*Interactive Journaling*® is registered in the U.S. Patent and Trademark Office.

Photographs in this Journal are used for illustrative purposes only and do not depict actual program participants.

The purpose of this Journal is to help educate, inform and enlighten individuals. It is sold with the understanding that the authors and publishers should not be substituted for those offering professional, psychological, therapeutic or diagnostic services. If expert assistance is required, the service of a competent professional should be sought.

ISBN-13: 978-1-61702-259-3  Version 2.0

**Bureau of Prisons**
**Psychology Services**
**Group Participation**

**SENSITIVE BUT UNCLASSIFIED**

| | | | | |
|---|---|---|---|---|
| **Inmate Name:** RADULESCU, ALEXANDRU | | | **Reg #:** 87932-054 | |
| **Date of Birth:** 04/13/1986 | **Sex:** M | **Facilitator:** (P)Johnson, Min Kyoung MA, DTS | | |
| **Date:** 03/24/2021 | **Group Facility:** NYM | **Group Title:** [114] Strategies for change | | |

**Status:** Completed

**Enroll Date:** 03/24/2021   **End Date:** 06/30/2021

**Total Hours:** 18.0

## SESSION DATA:

**Number of Sessions:** 15    **First Session Date:** 03/24/2021    **Last Session Date:** 06/30/2021

| Date | Title | Duration | Attendance | Participation | Homework |
|---|---|---|---|---|---|
| 06/30/2021 | Moving Forward | 90 | Complete Session | Good | Satisfactory |
| 06/22/2021 | Decision Making Skills and Coping Skills | 90 | Complete Session | Good | Satisfactory |
| 06/16/2021 | Stages of change | 90 | Complete Session | Good | Satisfactory |
| 06/09/2021 | Triggers and Prevention II | 90 | Absent Excused | Not Apply | Not Apply |
| 06/02/2021 | Triggers and Prevention I | 90 | Complete Session | Good | Satisfactory |
| 05/26/2021 | Cancellation | 0 | Absent Excused | Not Apply | Not Apply |
| 05/19/2021 | Group treatment cancellation | 0 | Absent Excused | Not Apply | Unsatisfactory |
| 05/12/2021 | NA | 0 | Absent Excused | Not Apply | Not Apply |
| 05/05/2021 | Rational Self-Counseling | 90 | Complete Session | Good | Satisfactory |
| 04/28/2021 | 8 criminal thinking errors | 90 | Complete Session | Good | Satisfactory |
| 04/23/2021 | The ABCs of Thinking | 90 | Complete Session | Good | Satisfactory |
| 04/14/2021 | Difficult feelings | 90 | Absent Excused | Not Apply | Not Apply |
| 04/07/2021 | 8 Positive Attitudes for Change | 90 | Complete Session | Good | Satisfactory |
| 03/31/2021 | Introduction: Exploring Motivation and Values | 90 | Complete Session | Fair | Satisfactory |
| 03/24/2021 | Orientation | 90 | Complete Session | Good | Not Apply |

| Attendance | | Participation | | Homework | |
|---|---|---|---|---|---|
| Complete Session Present | 66.7 % | Good | 60.0 % | Not Apply | 33.3 % |
| Incomplete Session Excused | 0.0 % | Fair | 6.7 % | Satisfactory | 60.0 % |
| Incomplete Session Not Excused | 0.0 % | Poor | 0.0 % | Unsatisfactory | 6.7 % |
| Absent Excused | 33.3 % | Not Apply | 33.3 % | | |
| Absent Not Excused | 0.0 % | | | | |

**Bureau of Prisons**
**Psychology Services**
**NRDAP - Psychosocial Interview**

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | RADULESCU, ALEXANDRU | | | | Reg #: | 87932-054 |
| Date of Birth: | 04/13/1986 | Sex: | M | Facility: NYM | Unit Team: | EN |
| Date: | 03/12/2021 11:43 | Provider: | Johnson, Min Kyoung MA, DTS | | | |

## Social Background

Mr. Radulescu is a 34-year-old Romanian male. He reported growing up in Romania with his mother and a younger sister. He noted his parents were divorced in 2000. He explained that he had a good relationship with his family; however, he currently does not communicate with his family due to his incarceration.

Mr. Radulescu has never been married and is currently involved in a relationship with his girlfriend. He claimed that he often communicates with his girlfriend via phone. He reported having no children.

When asked about a family history of substance abuse, Mr. Radulescu denied that anyone in his immediate family has a history of substance abuse.

When asked about a family history of mental illness, Mr. Radulescu replied, "My father has mental illness, but I don't know what he has."

Mr. Radulescu obtained his Bachelor's Degree in 2018.

When asked about his social life, Mr. Radulescu reported that approximately 80% of his friends and associates use substances, including marijuana, crack/cocaine, and synthetic cannabinoids. He believes that his friends and associates' substance use behaviors had a negative influence on him.

## Criminality

Mr. Radulescu reported that he had never been incarcerated in the past.

Mr. Radulescu is currently incarcerated for Device Fraud and Wire Fraud. He reported he believes his substance use is involved in the events which led to his arrest. When asked how his involvement in criminal behavior has been a problem for him, Mr. Radulescu admitted that he often engaged in illegal behavior to continue his substance use behavior.

## Substance Abuse

Mr. Radulescu reported a history of using marijuana, crack/cocaine, and synthetic cannabinoids. He noted his first use of marijuana and cocaine/crack was at the age of 18, and synthetic cannabinoids was at the age of 25 leading up to his arrest. He has a history of using up to 20 joints of marijuana daily, "10 pills" of crack/cocaine monthly, and two grams of synthetic cannabinoids monthly. Mr. Radulescu reported using drugs to be relaxed and stated, "I felt I was useless when I did not use drugs." He noted several negative consequences of his substance use, including legal problems and family obligations. Mr. Radulescu reported that he had never received treatments for drug abuse in the past.

## Mental Illness

Mr. Radulescu denied any other history of mental health problems. Currently, he does not receive any mental health treatment in BOP. When he asked about his current mental health, he replied, "I am stressed out."

## Personal Goals

When asked about his goals for treatment, Mr. Radulescu stated, "I want to stop using drugs."

When asked about how he would know the program has been effective for him, Mr. Radulescu mentioned, "I will never think about drugs again. I will find out."

**Bureau of Prisons**
**Psychology Services**
**Non-Residential DAP**

**SENSITIVE BUT UNCLASSIFIED**

| | | | | |
|---|---|---|---|---|
| **Inmate Name:** RADULESCU, ALEXANDRU | | | **Reg #:** 87932-054 | |
| **Date of Birth:** 04/13/1986 | **Sex:** M | **Race:** WHITE | **Facility:** NYM | |
| **Open Date:** 04/27/2021 | **Closed Date:** 07/07/2021 | **Status:** Complete | **Discussed:** Yes | |

**PGI Title:** Overall Progress

**Status:** Active          **Last Updated:** 04/27/2021     **Last Provider:** Johnson, Min Kyoung MA, DTS

**Problem:** I have led a disordered lifestyle that has had a negative impact on many aspects of my life so I have volunteered to participate in this treatment program to help me address my specific problems.

**Goal:** Incorporate the principles and techniques of this treatment program to address my thinking errors and modify my problematic behaviors.

**Interventions:** -Full program participation as directed and reviewed by my clinical team.

-Increased and practicing open-mindedness.

-Punctually attending each session and completing group and personal assignments.

**Progress Notes:**

| | | | |
|---|---|---|---|
| Demonstrates problems in this area | **Date:** 07/07/2021 | **Provider:** Johnson, Min Kyoung MA, DTS |
| Understands concepts and demonstrates behavior(s) indicative of treatment progress | **Date:** 07/07/2021 | **Provider:** Johnson, Min Kyoung MA, DTS |

**PGI Title:** Substance Abuse

**Status:** Active          **Last Updated:** 05/03/2021     **Last Provider:** Johnson, Min Kyoung MA, DTS

**Problem:** I have a problem with abusing substances. This abuse has affected my home life. Specifically, I became distant from my family. Especially, I used to have a close relationship with my sister; however, I do not communicate with my sister due to my substance use.

**Goal:** Lead a drug-free lifestyle, utilizing healthy coping mechanisms to manage unpleasant emotions and engage in physically and emotionally healthy leisure activities.

**Interventions:** - I will be honest about my previous substance use with my group members and increase my ability to share my drug use experiences during group sessions at least once. During group discussions, I will identify at least two triggers related to my substance use and ask group members for feedback. I will receive their constructive feedback.

- To learn how to make positive changes in my life, I will complete the group and personal journals before group sessions. I will identify what stage of change I am in and learn how to move forward to recovery. I will share my progress with group members at least once and receive their feedback.

- I will complete at least three RSAs worksheets related to my substance use. To complete RSAs, I will utilize the ABCs of thinking and define my errors in thinking. I explore and discuss my progress during group sessions and learn how irrational thinking patterns impact me negatively.

**PGI Title:** Lifestyle Balance

**Status:** Active          **Last Updated:** 04/27/2021     **Last Provider:** Johnson, Min Kyoung MA, DTS

**Problem:** One of the problems I have is that various parts of my life are out of balance. Specifically, I tended to be isolated from family and friends. I experienced financial hardships and legal problems due to my drug seeking-behavior.

**Goal:** To live a more well-rounded life. This includes physical, emotional, and spiritual health, as well as substance abuse and criminal lifestyle issues.

**Interventions:** - I will use eight positive attitudes daily to reconnect with my family and friends. I will complete at least one Attitude Check to define which attitude(s) I struggle with. I will share my progress with my group members and ask them for feedback.

- I struggle with expressing my feelings in healthy ways. I will learn how ignoring complicated feelings

| Inmate Name: | RADULESCU, ALEXANDRU | | | Reg #: | 87932-054 |
|---|---|---|---|---|---|
| Date of Birth: | 04/13/1986 | Sex: | M | Race: WHITE | Facility: NYM |
| Open Date: | 04/27/2021 | Closed Date: 07/07/2021 | | Status: Complete | Discussed: Yes |

negatively impacts my physical and emotional well-being while I complete group and personal journals. I will share my progress with my group members at least once and learn how to address my difficult feelings healthily.

- I will develop and practice healthy hobbies and habits to maintain my recovery. I will share my experience at least once during group sessions and have the open-mindedness to learn new healthy hobbies and habits from group members.

**Progress Notes:**

| | | |
|---|---|---|
| Understands concepts and demonstrates behavior(s) indicative of treatment progress | Date: 07/07/2021 | Provider: Johnson, Min Kyoung MA, DTS |
| Understands concepts and demonstrates behavior(s) indicative of treatment progress | Date: 07/07/2021 | Provider: Johnson, Min Kyoung MA, DTS |

**Comments:**

Successfully completed.

**EXHIBIT H**



**P.O. Box 535**
**Pinole, CA 94564**
**Email: CORE.educators@gmail.com**

*Criminal Offender Reform Establishment*

a Change of Heart **2** a Heart of Change

A GROUP OF
EDUCATORS WHO
BELIEVE IN THE
POWERS OF
CONSIDERATION,
CHOICE, AND
CHANGE

*July 20, 2022*

## *Alexandru Radulescu, 87932054*

*LETTER OF RECOGNITION*

To whom it may concern:

Please commend the aforementioned inmate for successful completion of **"DREAMING IN COLOR,"** a comprehensive correspondence course specifically designed for incarcerated individuals. The objective of this course was to provide the student with unique ways of dreaming about one's life. The course also teaches how thinking outside of the box and thinking fanatical can promote new ideas and inspire others to dream big. Then students learn how to turn their dreams into a reality.

It should be noted that the inmate student voluntarily requested to take this course which demonstrates initiative and a genuine interest in their well-being. Taking an honest, objective look into one's own mind is oftentimes a challenging task which require courage and a higher level of maturity. Please acknowledge the insight gained from the topic material and the sense of concern and care revealed by taking this course.

**"DREAMING IN COLOR"** is provided by CORE, Criminal Offender Reform Establishment, a non-profit organization that provides correspondent courses to incarcerated individuals with the hope of moving "a change of heart to a heart of change"

Thank you in advance for your time and consideration.

Sincerely,

A. Wyatt

CORE Administrator



P.O. Box 535
Pinole, CA 94564
Email: CORE.educators@gmail.com

*Criminal Offender Reform Establishment*

a Change of Heart 2 a Heart of Change

A GROUP OF
EDUCATORS WHO
BELIEVE IN THE
POWERS OF
CONSIDERATION
CHOICE, AND
CHANGE

*July 20, 2022*

## Alexandru Radulescu, 87932054

*LETTER OF RECOGNITION*

To whom it may concern:

Please commend the aforementioned inmate for successful completion of **"GOAL GAINING,"** a comprehensive correspondence course specifically designed for incarcerated individuals. The objective of this course was to provide the student with functional tools to apply to their lives and their personal goals. The course also teaches how setting goals is healthy and important. Planning for the future and attaining realistic goals will increase self-esteem and confidence.

It should be noted that the inmate student voluntarily requested to take this course which demonstrates initiative and a genuine interest in their well-being. Taking an honest, objective look into one's own mind is oftentimes a challenging task which require courage and a higher level of maturity. Please acknowledge the insight gained from the topic material and the sense of concern and care revealed by taking this course.

**"GOAL GAINING"** is provided by CORE, Criminal Offender Reform Establishment, a non-profit organization that provides correspondent courses to incarcerated individuals with the hope of moving "a change of heart to a heart of change"

Thank you in advance for your time and consideration.

Sincerely,

*A. Wyatt*
CORE Administrator



P.O. Box 535
Pinole, CA 94564
Email: CORE.educators@gmail.com

*Criminal Offender Reform Establishment*

a Change of Heart **2** a Heart of Change

A GROUP OF
EDUCATORS
WHO BELIEVE IN
THE POWERS OF
CONSIDERATION,
CHOICE, AND
CHANGE

*July 20, 2022*

**Alexandru Radulescu, 87932054**

*LETTER OF RECOGNITION*

To whom it may concern:

Please commend the aforementioned inmate for successful completion of **"BIOLOGICAL BLUEPRINT,"** a comprehensive correspondence course specifically designed for incarcerated individuals. The objective of this course was to give the student a clear picture of who they are as a person based on their economic factors, family types, inherited qualities, etc. The course also teaches the student that their background and past experiences do not necessarily control who they ultimately want to be. Each individual is responsible for the choices they make and in essence, it is their decisions that truly depict their inner character and qualities.

It should be noted that the inmate student voluntarily requested to take this course which demonstrates initiative and a genuine interest in their well-being. Taking an honest, objective look into one's own mind is oftentimes a challenging task which require courage and a higher level of maturity. Please acknowledge the insight gained from the topic material and the sense of concern and care revealed by taking this course.

**"BIOLOGICAL BLUEPRINT"** is provided by CORE, Criminal Offender Reform Establishment, a non-profit organization that provides correspondent courses to incarcerated individuals with the hope of moving "a change of heart to a heart of change"

Thank you in advance for your time and consideration.

Sincerely,

*A. Wyatt*

CORE Administrator



**P.O. Box 535**
**Pinole, CA 94564**
**Email: CORE.educators@gmail.com**

*Criminal  Offender  Reform  Establishment*

a Change of Heart **2** a Heart of Change

A GROUP OF
EDUCATORS WHO
BELIEVE IN THE
POWERS OF
CONSIDERATION,
CHOICE, AND
CHANGE

*May 19, 2022*

**Alexandru Radulescu, 87932054**

*LETTER OF RECOGNITION*

To whom it may concern:

Please commend the aforementioned inmate for successful completion of **"MINDSET MAKEOVER,"** a comprehensive correspondence course specifically designed for incarcerated individuals. The objective of this course was to give the student a clear idea into the way they think and provide them with many constructive ways to change their thought process and ultimately change the outcome of their lives. The course also teaches that defeating behaviors derive from unhealthy thoughts while the in-depth curriculum helps students pinpoint their own destructive thoughts and begin to change those thinking patterns for the better.

It should be noted that the inmate student voluntarily requested to take this course which demonstrates initiative and a genuine interest in their well-being. Taking an honest, objective look into one's own mind is oftentimes a challenging task which require courage and a higher level of maturity. Please acknowledge the insight gained from the topic material and the sense of concern and care revealed by taking this course.

**"MINDSET MAKEOVER"** is provided by CORE, Criminal Offender Reform Establishment, a non-profit organization that provides correspondent courses to incarcerated individuals with the hope of moving "a change of heart to a heart of change"

Thank you in advance for your time and consideration.

Sincerely,

*A. Wyatt*

CORE Administrator



P.O. Box 535
Pinole, CA 94564
Email: CORE.educators@gmail.com

*Criminal Offender Reform Establishment*

α Change of Heart **2** α Heart of Change

A GROUP OF
EDUCATORS
WHO BELIEVE IN
THE POWERS OF
CONSIDERATION
,CHOICE, AND
CHANGE

*May 19, 2022*

**Alexandru Radulescu, 87932054**

LETTER OF RECOGNITION

To whom it may concern:

Please commend the aforementioned inmate for successful completion of **"PERSPECTIVE PERSONIFIED,"** a comprehensive correspondence course specifically designed for incarcerated individuals. The objective of this course was to give the student a clear understanding into how their point of views are limited and one sided which is often the cause of conflicts. The course teaches how to see people, incidents, concepts, and emotions objectively to enhance decision making skills and improve interpersonal relations.

It should be noted that the inmate student voluntarily requested to take this course which demonstrates initiative and a genuine interest in their well-being. Taking an honest, objective look into one's own mind is oftentimes a challenging task which require courage and a higher level of maturity. Please acknowledge the insight gained from the topic material and the sense of concern and care revealed by taking this course.

**"PERSPECTIVE PERSONIFIED"** is provided by CORE, Criminal Offender Reform Establishment, a non-profit organization that provides correspondent courses to incarcerated individuals with the hope of moving "a change of heart to a heart of change"

Thank you in advance for your time and consideration.

Sincerely,

*A. Wyatt*
CORE Administrator

# EXHIBIT I



# CROSSROADS

# CERTIFICATE OF ACHIEVEMENT

THIS CERTIFIES THAT

# Alexandru Radulescu

HAS SUCCESSFULLY COMPLETED

## WHO ARE YOU?

September 29, 2021

Lisa Blystra
President & CEO, Crossroads

Date

CROSSROADS

# CERTIFICATE OF ACHIEVEMENT

THIS CERTIFIES THAT

## Alexandru Radulescu

HAS SUCCESSFULLY COMPLETED

### WHO IS JESUS?

Joseph Pryor
President & CEO, Crossroads

May 17, 2022

Date

# Certificate of Achievement

This Certifies That

## Alexandru Radulescu

Completed Religious Services' Faith Based Program

## THE KEY TO YOUR EXPECTED END

MCC New York Religious Services Re-entry Program

On This 29th Day of May 2021

_Steve Mun, Chaplain_

*God bless You!*



# MDC Brooklyn
# Recreation Department

*This is to Certify that*

## Alexandru Radulescu

*Has Successfully Completed:*

### Diabetes and You-Sentry Course

*At MDC Brooklyn*

*This certificate is hereby issued this 6th day of May 2022*

**D. Ranalli**

*Recreation Specialist*



# MDC Brooklyn
# Recreation Department

*This is to Certify that*

## Alexandru Radulescu

*Has Successfully Completed:*

## Cardmaking-Sentry Course

*At MDC Brooklyn*

*This certificate is hereby issued this 29ᵗʰ day of May 2022*

### D. Ranalli

*Recreation Specialist*

Case 1:19-cr-00691-SHS   Document 1016   Filed 07/19/22   Page 67 of 83

# CERTIFICATE *of* ACHIEVEMENT

### THIS ACKNOWLEDGES THAT

## Alexandru Radulescu

#### HAS SUCCESSFULLY COMPLETED THE SUICIDE WATCH COMPANION TRAINING

## METROPOLITAN CORRECTIONAL CENTER
## NEW YORK, NEW YORK

_____
R. Maldonado, Acting Warden

JUNE
2021

_____
E. Miller, PsyD
Chief Psychologist

_____
B. Paster, PhD
Clinical Psychologist
Inmate Companion Coordinator

# Certificate of Completion

Metropolitan Detention Center, Brooklyn
Brooklyn, New York

*This certifies that:*

## Alexandru Radulescu
### Reg. No. 87932-054

## has satisfactorily completed

### Personal Growth Workbook

*and is hereby awarded this certificate, this 28th day of April, 2022*

Dr. L
Staff Psychologist

# CERTIFICATE *of* APPRECIATION

### THIS ACKNOWLEDGES THAT

## Alexandru Radulescu

## DEDICATED 54 HOURS THIS MONTH TO THE

### SUICIDE PREVENTION & INMATE COMPANION PROGRAM AT MCC NEW YORK



*June 2021*

*Brittni Poster, Ph.D., Clinical Psychologist*
Inmate Companion Coordinator

# *Certificate of Completion*

Metropolitan Detention Center, Brooklyn
Brooklyn, New York

*This certifies that:*

## *Alexandru Radulescu*
### *Reg. No. 87932-054*

## *has satisfactorily completed*

## *Healthy Relationships Workbook*

*and is hereby awarded this certificate, this 26ᵗʰ day of May, 2022*



_____

Dr. L
Staff Psychologist

# *Certificate of Completion*

Metropolitan Detention Center, Brooklyn
Brooklyn, New York

*This certifies that:*

## *Alexandru Radulescu*
### *Reg. No. 87932-054*

## *has satisfactorily completed*

### *Getting Back on Track Workbook*

*and is hereby awarded this certificate, this 13th day of April, 2022*



Dr. L
Staff Psychologist



# Certificate of Completion

This certificate is presented to

## Alexandru Radulescu

*For Outstanding Participation and the Completion of the Self-Help Course*

### DREAMING IN COLOR

_A. Wyatt_     7/20/2022

**CORE ADMINISTRATOR**     **DATE**

Criminal Offender Reform Establishment



a Change of Heart 2 a Heart of Change

P.O. Box 535
Pinole, CA 94564
Email: CORE.educators@gmail.com



# Certificate of Completion

This certificate is presented to

## Alexandru Radulescu

*For Outstanding Participation and the Completion of the Self-Help Course*

### GOAL GAINING

A. Wyatt                    7/20/2022

**CORE ADMINISTRATOR**              **DATE**



Criminal Offender Reform Establishment

a Change of Heart 2 a Heart of Change

P.O. Box 535
Pinole, CA 94564
Email: CORE.educators@gmail.com



# Certificate of Completion

This certificate is presented to

## Alexandru Radulescu

*For Outstanding Participation and the Completion of the Self-Help Course*

### *BIOLOGICAL BLUEPRINT*

A. Wyatt                    7/20/2022

**CORE ADMINISTRATOR**          **DATE**



Criminal  Offender  Reform  Establishment

a Change of Heart 2 a Heart of Change

P.O. Box 535
Pinole, CA 94564
Email: CORE.educators@gmail.com



# Certificate of Completion

This certificate is presented to

## Alexandru Radulescu

*For Outstanding Participation and the Completion of the Self-Help Course*

### MINDSET MAKEOVER

*A. Wyatt*                    5/19/2022

**CORE ADMINISTRATOR**        **DATE**



Criminal  Offender  Reform  Establishment

a Change of Heart 2 a Heart of Change

P.O. Box 535
Pinole, CA 94564
Email: CORE.educators@gmail.com



# Certificate of Completion

This certificate is presented to

## Alexandru Radulescu

*For Outstanding Participation and the Completion of the Self-Help Course*

## *PERSPECTIVE PERSONIFIED*

A. Wyatt  5/19/2022

**CORE ADMINISTRATOR**  **DATE**



Criminal Offender Reform Establishment

a Change of Heart 2 a Heart of Change

P.O. Box 535
Pinole, CA 94564
Email: CORE.educators@gmail.com

# ACCI Lifeskills

certifies that

## ALEXANDRU RADULESCU

has successfully completed the

## PERSONAL RESPONSIBILITY COURSE

**Agency:** **Metropolitan Detention Center, Brooklyn MDC**
**Completion Date:** **Jun 03, 2022**
**Case Number:** **8793204**





*Kyli Richins*
Authorized Signature



Certificate Key: 1b96a3b0-4421-11ec-b0fd-0793e4a02780

# ACCI Lifeskills

certifies that

## ALEXANDRU RADULESCU

has successfully completed the

## EMPLOYMENT COURSE

**Agency:** Metropolitan Detention Center, Brooklyn MDC
**Completion Date:** May 26, 2022
**Case Number:** 87932054





*Kyli Richins*
Authorized Signature



Certificate Key: b8bd7350-39b8-11ec-a431-29b0a1122edd

# *ACCI Lifeskills*

certifies that

## ALEXANDRU RADULESCU

has successfully completed the

## DOMESTIC VIOLENCE COURSE

**Agency:** Metropolitan Detention Center, Brooklyn MDC
**Completion Date:** Dec 28, 2021
**Case Number:** 87932054









**Authorized Signature**

Certificate Key: b8bd7350-39b8-11ec-a431-29b0a1122edd

# *ACCI Lifeskills*

certifies that

# ALEXANDRU RADULESCU

has successfully completed the

# DOMESTIC VIOLENCE COURSE



**Agency:** Metropolitan Detention Center, Brooklyn MDC
**Completion Date:** Dec 28, 2021
**Case Number:** 87932054







**Authorized Signature**

Certificate Key: b8bd7350-39b8-11ec-a431-29b0a1122edd

# ACCI Lifeskills

certifies that

## ALEXANDRU RADULESCU

has successfully completed the

## CONTENTIOUS RELATIONSHIPS COURSE



**Agency:** Metropolitan Detention Center, Brooklyn MDC
**Completion Date:** Dec 28, 2021
**Case Number:** 87932054





*Kyli Richins*

**Authorized Signature**

Certificate Key: b8bd7350-39b8-11ec-a431-29b0a1122edd

# ACCI Lifeskills

certifies that

## ALEXANDRU RADULESCU

has successfully completed the

## ANGER MANAGEMENT COURSE

**Agency:** Metropolitan Detention Center, Brooklyn MDC
**Completion Date:** May 26, 2022
**Case Number:** 8793204







*Kyli Richins*
Authorized Signature

Certificate Key: 1b96a3b0-4421-11ec-b0fd-0793e4a02780

**EXHIBIT J**